## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## THOMASVILLE DIVISION

| | | |
|---|---|---|
| GENI AKRIDGE, et al., | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **Civil Action No.** |
| | : | **6:04-CV-31 (HL)** |
| CITY OF MOULTRIE, GEORGIA, a | : | |
| body corporate, | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 18) in which Defendant asks the Court to dismiss Plaintiffs' claims. For the reasons explained below, Defendant's Motion is granted in part and denied in part. Specifically, Plaintiffs' FHA and ADA claims based on intentional discrimination, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 based on the intentional discrimination under the FHA or ADA, and Plaintiffs' claims under 42 U.S.C. § 1983 based on equal protection violations are dismissed with prejudice. Plaintiffs' FHA and ADA claims based on Defendant's failure to make a reasonable accommodation and Plaintiffs' claims pursuant to 42 U.S.C. § 1983 based on Defendant's failure to make a reasonable accommodation under the FHA and ADA remain.

### I. FACTS

#### A. Ivydale

Construing the evidence in the light most favorable to the non-moving party, the Court

finds as follows. In May of 2003, Plaintiff Geni Akridge met with employees of Defendant, the City of Moultrie, to determine whether her proposed plan of opening an home, which she called Ivydale, to care for elderly disabled elderly individuals would be prohibited by the city's zoning code. She was told by Defendant's employees that nothing in the zoning code prohibited her plan. Plaintiff Akridge also met, in June of 2003, with Defendant's employees to confirm the information she had been given earlier. She was again told that the city's zoning code did not prohibit her planned residential home. As a result of the favorable information she received from Defendant, Plaintiff Akridge purchased a residence located on ten acres of land.

In July of 2003, after receiving several complaints from city residents about having a retirement center in the middle of a residential district, the Moultrie City Council discussed the matter at a strategic planning retreat. The consensus of those in attendance was that Plaintiff Akridge's planned use of her property was not appropriate for a single family residential area. After the retreat, Plaintiff Akridge was contacted by Defendant's city planner. In that conversation Plaintiff Akridge explained that she intended to have three elderly persons live with her and her mother and that she would employ a maid to cater to their needs. Defendant's city planner replied that Plaintiff Akridge's proposed use of her property would not be very different from having a couple of roommates and collecting money from them for rent and utilities.

In a July 16, 2003 e-mail that Defendant's city planner sent to Defendant's city manager, recounting the conversation he had had with Plaintiff Akridge, the city planner commented that the city's current zoning ordinances did not address the proposed use of Plaintiff Akridge's

property. He also advised the city manager that according to Plaintiff Akridge's statements, the proposed use of her property was not that of a "nursing home" or "convalescence home." He stated that Plaintiff Akridge's proposed use was close to a "boarding house" or "elderly housing," but, in his opinion, was essentially a single family dwelling under the city's current zoning codes.

On July 25, 2003, Plaintiff Akridge met with the Planning and Growth Subcommittee of the city council. She was asked to explain the intended use of her property. She stated that she planned to rent three rooms to elderly individuals that could no longer take care of themselves. She was then advised by the city manager that her intended use of operating a "personal care home/assisted living facility" was not permitted in a single family residential zone. She was instructed to submit a written explanation of the present and future uses of her property and to contact her neighbors about what concerns they may have.

On August 4, 2003, Plaintiff Akridge submitted a written explanation of the present and future uses of her property. In that explanation, she stated that she intended to offer room and board to four elderly persons with the potential of needing assisted living. She further stated that in the future she would like to provide care to five individuals. Plaintiff Akridge also explained that her mother wished to create an environment like the "Golden Girls" and live with other widowed ladies. Defendant's city manager responded to Plaintiff Akridge's explanation advising her that based on the information she provided, that the intended use of her property was prohibited by the city's zoning code. The city manager explained that although child care is permitted in single family zones, Plaintiff Akridge's proposed use qualified as a boarding

house, which was not permitted in single family zones.

Prior to Defendant's city manager's response to Plaintiff Akridge concerning the proposed use of her property, Plaintiff Akridge consulted with the Georgia Office of Regulatory Services concerning her plans to provide housing for up to six or fewer disabled persons. She was advised that her proposed use was permissible in single family zones and protected by the Fair Housing Act because she intended to house elderly disabled individuals. Six months later, in January of 2004, the Georgia Department of Human Services issued a personal care home provisional sixth-month permit to Plaintiff Akridge to maintain and operate a personal care home for up to three persons.

In February of 2004, Plaintiff Akridge wrote a letter to her Congressman, Sanford Bishop, complaining that Defendant was violating the law by prohibiting her from providing assisted living services in her home for elderly disabled persons. She specifically stated "old age is a disability when the elderly can no longer live alone and are in need of a group home." She further added, "Disabled persons must have an option to live in residential areas of choice. Moultrie only provides for the elderly in commercially zoned areas." Congressman Bishop forwarded Plaintiff Akridge's complaint to Defendant's city manager for a response. On April 12, 2004, Defendant's city manager responded to Congressman Bishop's request and denied that Defendant had done anything wrong. He explained that Plaintiff Akridge's proposed use violated the city's zoning code and that the Fair Housing Act did not prohibit Defendant from enforcing its zoning code.

Meanwhile, Defendant had instituted criminal proceedings against Plaintiff Akridge for

4

allegedly violating the city's zoning code. After an April 6, 2004 city council meeting Defendant's city manager was directed to initiate legal action against Plaintiff Akridge for allegedly operating a personal care home in a residential area. There is no evidence that anyone but Plaintiff Akridge and her immediate family were living or had been living in her home prior to April 6, 2004. Nevertheless, Plaintiff Akridge was charged with operating a personal care home out of a single family residence. She was issued a summons to appear before the municipal court judge to answer the charge.

While awaiting her court date, Plaintiff Akridge wrote another letter to Defendant's city manager requesting an exemption from the single family zoning ordinance to afford "handicapped persons equal opportunity to use and enjoy a dwelling in a residential community." She also argued that "elderly disabled persons deserve a choice in their housing other than the large facilities presently available." In addition, she attempted to assure the city manager that the use of her home to house "disabled persons [would] not change the internal or external structure from that of a single family home nor the primary use in that my family does live in the home." There is no evidence that Defendant or Defendant's employees ever responded to Plaintiff Akridge's request.

Plaintiff Akridge then, on June 24, 2004, filed this cause of action in federal court alleging violations of the Fair Housing Act, the Americans with Disabilities Act, and her constitutional right to equal protection. The lawsuit is brought by Plaintiff Akridge, the co-owner of the property in question; Plaintiffs John and Jane Does 1-6, which represent six disabled individuals that plan to reside in Ivydale; and Plaintiff Ivydale, an unincorporated

association established to provide residential housing for six elderly disabled individuals.

In late August of 2004, apparently as part of an investigation into Plaintiff Akridge's alleged zoning ordinance violations, Defendant obtained the script of a radio spot that had run on a local radio station offering Ivydale assisted living services. The script reads as follows: "A glad supporter of this station is Ivydale of Moultrie. Ivydale is a family modeled assisted living home that serves individuals of South Georgia who can no longer live alone. They offer private rooms in a home setting. Appointments are available." Records from the radio station show that the spot ran a total of four times a week from April 15, 2004 until August 25, 2004.

Defendant also obtained a copy of a current print advertisement offering Ivydale assisted living services. The print ad listed Plaintiff's operation as  "family model assisted living" and offered the following services: "full housekeeping, assistance w/daily needs, supervised medication, nutritious snacks, three meals daily, [and] laundry services." The ad also stated that occupancy was limited and provided a telephone number to call for an appointment.

In late 2004, Plaintiff Akridge agreed to a consent order to resolve her criminal municipal case. Plaintiff Akridge agreed to refrain from advertising Ivydale assisted living services or operating any type of personal care home until the resolution of this lawsuit in federal court. Since that time two additional individuals have resided in Plaintiff Akridge's home. First, Plaintiff Akridge's aunt resided at Plaintiff Akridge's home for a period of two months beginning in March of 2005 after breaking her hip. A second individual, J.D. Adams, also resided at Plaintiff Akridge's home while his family was on a two-week vacation.

B. Plaintiffs' Claims

Plaintiffs assert three main claims. First, Plaintiffs allege Defendant violated the Fair Housing Act by (1) discriminating against Plaintiffs by making residential living unavailable to them due to their disability; (2) threatening and interfering with Plaintiffs due to their disability by charging Plaintiff Akridge with a criminal violation; and (3) failing to make a reasonable accommodation in the application of zoning codes to allow Plaintiffs to live in a residential setting.[1]

Second, Plaintiffs allege Defendant violated the Americans with Disabilities Act by (1) discriminating against Plaintiffs by making residential living unavailable to them due to their disability; (2) enforcing the Moultrie Municipal Zoning Code differently with respect to Plaintiffs than other groups of similar individuals; and (3) establishing licensing and permit requirements to deny Plaintiffs the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others.[2]

Finally, Plaintiffs assert a claim under 42 U.S.C. § 1983. Plaintiffs allege Defendant, under color of state law, denied Plaintiffs the equal protection of the law by (1) arbitrarily and irrationally applying its zoning code to limit Plaintiffs' residential opportunities; and (2) prosecuting Plaintiff Akridge for a zoning code violation solely on the basis of disability or

---

[1]Although Plaintiffs' Complaint lists eight separate allegations in connection with the Fair Housing Act, the Court lists three general claims which encompass all of Plaintiffs' specific allegations.

[2]Again, Plaintiffs' Complaint lists multiple allegations in connection with the Americans with Disability Act; however, the Court only lists three broad claims which encompass all Plaintiffs' specific allegations.

being associated with a person with a disability.

C. Defendant's Motion for Summary Judgment

Defendant argues that Plaintiffs cannot establish two essential elements common to all claims. First, Defendant argues that Plaintiffs have not and cannot establish a protected disability within the meaning of either the Fair Housing Act or the Americans with Disabilities Act. Defendant bases this argument on the premise that the only disability Plaintiffs assert is old age. According to Defendant, because old age alone is not recognized as a disability, Plaintiffs cannot establish that they were discriminated against on the basis of a protected disability. In the alternative, even if Plaintiffs can establish a protected disability, Defendant argues Plaintiffs can sustain none of their claims because Defendant did not discriminate. Defendant asserts it has done nothing but fairly apply the city's zoning code.

**II. ANALYSIS**

A. Summary Judgment Standard

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court must evaluate all evidence and any logical inferences in a light most favorable to the non-moving party. Beckwith v. City of Daytona Beach Shores, 58 F.3d

1554, 1560 (11th Cir. 1995).

"[T]he plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time and discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant carries the initial burden and must meet this burden "by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Id. at 325. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.  The nonmoving party must put forth more than a "mere 'scintilla' of evidence;" "there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Thus, under Rule 56 summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

B. Handicap under the Fair Housing Act and Disability under the Americans with Disabilities Act

The definitions of handicap under the under The Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3631 (2000), and disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (2000), are virtually identical and any slight difference in the definitions is inconsequential to the issue before the Court. Therefore, to properly establish a protected disability or handicap under either the FHA or the ADA, a plaintiff must show (1) a physical or mental condition that substantially limits one or more major life activities, (2) a record of such condition, or (3) a history of being regarded as having such condition. Defendant argues that Plaintiffs can establish none of these possibilities because they are not protected by the FHA or ADA. In contrast, Plaintiff Akridge responds that the proposed use of her property is to care for elderly disabled individuals.

In this case, there are simply too many factual disputes relevant to this issue for the Court to conclude that Plaintiff Akridge's planned use of her property did not involve the care of "handicapped"individuals, as defined by the FHA, or "disabled" individuals, as defined by the ADA. First, Defendant directs the Court to several statements made by Plaintiff Akridge that could suggest that the planned use of her property only involved housing elderly non-disabled individuals, yet those same statements could also suggest that Plaintiff Akridge's planned use of her property involved caring for elderly individuals who needed help with one or more major life activities. While Plaintiff Akridge uses the word "elderly" without further elaboration in several of the identified statements, in others she offers more detail and states that she plans to

care for elderly individuals who need assistance with daily needs.

Defendant also points to two individuals, who lived with Plaintiff Akridge for a short period of time, and offers evidence to show that those individuals were not handicapped or disabled within the meaning of the FHA or the ADA. Plaintiff Akridge argues that these individuals were not clients, but simply guests in her home. Plaintiff Akridge asserts that one of the individuals identified by Defendant is her aunt who stayed with her while recovering from a broken hip. The other individual, according to Plaintiff Akridge, stayed for two weeks while recovering from a foot infection. Thus, even assuming the two individuals were not handicapped or disabled, the Court cannot grant Defendant's Motion for Summary Judgement based on the status of those individuals because there is a factual dispute as to whether those individuals were clients of Plaintiff Akridge's business or whether they were simply guests in her home.

Therefore, the Court finds that there is sufficient evidence that would allow a jury to conclude that Plaintiff Akridge's planned use of her property was the care of elderly handicapped or disabled individuals. Accordingly, whether Plaintiff Akridge's proposed use of her property was and is to care for disabled individuals is a matter for the jury. To the extent Defendant seeks summary judgement based on the argument that Plaintiffs are not protected under the FHA or ADA because Plaintiffs cannot establish a protected handicap or disability, Defendant's Motion is denied.

C. Discrimination under the FHA and ADA

Defendant next argues that even if Plaintiffs can establish a protected disability or

handicap, they cannot sustain any of their three claims because the undisputed evidence shows that the city correctly applied its zoning code.

The FHA and ADA both prohibit "governmental entities from implementing or enforcing housing policies in a discriminatory manner against persons with disabilities." Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 573 (2d Cir. 2003). The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, a person residing in or intending to reside in . . . and any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1) (2000). The ADA states that "no qualified individual with a disability[3] shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such public entity." 42 U.S.C. § 12132 (2000). Plaintiffs may establish a violation of either the FHA or ADA under three separate theories: (1) intentional discrimination, (2) disparate impact, or (3) failure to make a reasonable accommodation. Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002). It does not appear that Plaintiffs are attempting to assert claims based on disparate impact, so the Court will only address Plaintiffs' intentional discrimination and failure to make a reasonable accommodation claims.

---

[3] A "qualified individual with a disability" is defined as an "individual with a disability who, with or without reasonable modification to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2) (2000). Because Defendant only disputes whether Plaintiffs can establish a disability, the Court will not discuss whether or not Plaintiffs can establish a "qualified individual with a disability."

*i. Intentional Discrimination*

To establish intentional discrimination[4] under the FHA and ADA in this case, Plaintiffs must show that their handicapped or disabled status was a motivating factor in Defendant's decisions concerning the proposed use of Plaintiff Akridge's property. See Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265 (1977). Factors to consider in evaluating a claim of intentional discrimination include: (1) the impact of the official action, (2) any similar decisions by the administrative or governmental group that tend to establish a pattern, (3) the specific events leading up to the decision at issue, (4) any departures from normal operating procedure, and (5) any departures from objective criteria. See id. at 266-68.

Plaintiffs show, through deposition testimony, citizen complaints, and excerpts of Defendant's e-mail correspondence, that Defendant not only deviated from its normal operating procedure during the events leading up to this dispute, but also responded to significant community concern about Plaintiff Akridge's planned use of her property. Specifically, after numerous residents expressed concern over the operation of a business in their neighborhood, Defendant began investigating Plaintiff Akridge's planned use of the property she had recently acquired. As a result of this investigation a criminal complaint was filed against Plaintiff Akridge for an alleged violation of the city's zoning code. According to Captain Tommy Rabon

---

[4]Although claims of intentional discrimination are subject to the burden allocation announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for the purposes of this motion the Court assumes that Plaintiffs have met their prima facie burden and Defendant has proffered a non-discriminatory reason for its actions. In this case, Defendant asserts that it was simply trying to fairly enforce the city's zoning code.

of the Moultrie Police Force, the issuance of this type of criminal citation was extremely rare for the alleged violation of a city zoning ordinance.

Accordingly, there is evidence that tends to show Defendant deviated from its normal practice in enforcing the city's zoning code and that Defendant responded to significant public concern about Plaintiff Akridge's planned use of her property. Yet, even drawing every legitimate inference in favor of Plaintiffs, there is simply no evidence that Defendant's deviation from normal enforcement schemes or the public's concern was due, even in part, to the fact that Plaintiff Akridge's potential client base was composed of elderly or disabled individuals.

A letter from a group of concerned citizens and various e-mail correspondence between members of the city council and city administration establish that members of the community and individuals within the city council and city administration were concerned about Plaintiff Akridge's attempt to open a business in a single family residential neighborhood. Yet, none of the statements in the letter or e-mails either explicitly or implicitly suggest that the neighbors or members of the city council or city administration were opposed to Plaintiff Akridge's activities because she wanted to house elderly disabled individuals. In fact, the letters and e-mails suggest that the city council and neighbors were not concerned about who would be living in Plaintiff's business, but only that Plaintiff was attempting to open any type of business in a residential neighborhood.

Plaintiffs also point to Defendant's alleged misclassification of Plaintiff Akridge's planned use of her property as a boarding house as further evidence of Defendant's discriminatory intent.   Again, drawing every legitimate inference in favor of Plaintiffs,

Defendant's decision to classify Plaintiff Akridge's planned use of her property as a boarding house is not so irrational as to constitute evidence of discrimination. While the Court does not express an opinion as to whether Defendant's decision was correct, there clearly was enough evidence available to Defendant to reasonably conclude that Plaintiff Akridge's planned business fell within the city zoning code's definition of a boarding house.

In conclusion, Plaintiffs have shown Defendant responded to public concern that Plaintiff Akridge was attempting to open a business in a single family residential zone, used unprecedented enforcement procedures in filing a criminal complaint over a zoning violation, and chose to classify Plaintiff Akridge's planned use of her property as a boarding house. Without more, the Court cannot conclude without engaging in rank speculation or conjecture, that Defendant's proffered reason, that they were merely attempting to fairly enforce the city's zoning code, was a pretext for discrimination. Accordingly, Defendant's Motion for Summary Judgment, insofar as it asks the court to dismiss Plaintiffs' FHA and ADA claims based on intentional discrimination, is granted.

*ii. Reasonable Accommodation*

In addition to prohibiting intentional discrimination and disparate impact, the FHA and ADA both require public entities to make a reasonable modification or accommodation in its practices, services, and facilities. The FHA specifically prohibits the "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodation may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B) (2000). Likewise, the regulations promulgated pursuant to the ADA

require that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7) (2005).

In order to establish a prima facie case under the FHA or ADA for failure to make a reasonable accommodation, Plaintiffs must show that the accommodation requested was reasonable and necessary to afford handicapped or disabled individuals equal opportunity to enjoy the housing of their choice. See Smith &  Lee Assocs., Inc. v. City of Taylor, 102 F.3d 781, 794-95 (6th Cir. 1996)."Whether a requested accommodation is reasonable [or necessary] is highly fact-specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff." Dadian v. Village of Wilmette, 269 F.3d 831, 838 (7th Cir. 2001).

Generally, an accommodation is reasonable if the requested accommodation does not impose significant financial or administrative burdens upon the defendants, S. Cmty. Coll. v. Davis, 442 U.S. 397, 412 (1979), or substantial modifications to existing programs or policies that would fundamentally change the nature or function of the program or policy. Bryant Woods Inn, Inc. v. Howard County, Md., 124 F.3d 597, 604 (4th Cir. 1997). Further, showing that an accommodation is necessary requires a plaintiff to show a "direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person." Dadian, 269 F.3d at 838-839. (internal citations omitted). Thus, the requested accommodation should allow handicapped persons the ability to enjoy the benefits of a program or policy to the same

16

general extent as any non-handicapped person.

Defendant argues Plaintiffs cannot meet their burden because it is neither reasonable nor necessary to sacrifice the character of the neighborhood in question when residential assisted living space is already available in the city's other residential neighborhoods. In contrast, Plaintiffs argue that allowing Plaintiff Akridge to operate her home as planned would not sacrifice the character of the neighborhood and is necessary to provide elderly disabled individuals with the option of residing in residential neighborhoods. In a letter to Defendant's city manager, requesting an accommodation, Plaintiff Akridge explained that neither the internal nor external structure of her home would be disturbed by her proposed plan. She also noted that her home would primarily remain a family residence and no sign would be erected that would disturb the appearance of the neighborhood. Plaintiffs also allege that not allowing the requested accommodation forces Plaintiffs to seek housing in the business zones of the city.

As this issue is before the Court on a Motion for Summary Judgment, the Court must view the evidence in the light most favorable to Plaintiffs, the party opposing the motion. Accordingly, the Court finds that there is evidence in this case from which a reasonable jury could conclude that Plaintiffs' requested accommodation was reasonable because allowing Plaintiff Akridge to operate her center would not impose any financial or administrative burdens nor alter the nature of the single family residential neighborhood based on the assurances discussed above. Further, a reasonable jury could also conclude, based on the evidence, that Plaintiffs' requested accommodation was necessary under the circumstances to allow elderly disabled individuals with an opportunity to reside in single family residential neighborhoods.

17

Therefore, Defendant's Motion for Summary Judgment, insofar as it asks the court to dismiss Plaintiffs' FHA and ADA claims based on Defendant's failure to make a reasonable accommodation, is denied.

C. 42 U.S.C. § 1983

Insomuch as Plaintiffs' claims under 42 U.S.C. § 1983 are based on the deprivation of rights guaranteed under the FHA or ADA, Defendant's Motion for Summary Judgement with respect to those claims is granted in part and denied in part for the reasons expressed above. Specifically, Plaintiffs' § 1983 claims based on intentional discrimination are dismissed, and Plaintiffs' § 1983 claims based on Defendant's failure to make a reasonable accommodation remain. The remainder of Plaintiffs' § 1983 claim, which alleges an equal protection violation, is discussed below.

The Fourteenth Amendment's Equal Protection Clause requires that "any person within its jurisdiction" be afforded the "equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, states are required to treat similarly situated individuals similarly. There are generally two ways in which to establish equal protection violations: (1) establish that an official government statute or ordinance discriminates on its face against a non-suspect category of persons; and (2) establish that a governmental body applied a facially neutral ordinance in a discriminatory manner. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 442-47 (1985). With respect to the first type of cases, Courts must determine whether there is a rational relationship between the statute's or ordinance's classification and a legitimate governmental interest; however, in cases involving the unequal administration of a neutral statute or ordinance,

plaintiffs must show intentional discrimination. See id.; Snowden v. Hughes, 321 U.S. 1, 8 (1994); E & T Realty v. Strickland, 830 F.2d 1107, 1112-13 (11th Cir. 1987).

In this case, Plaintiffs do not allege that Defendant's city ordinance code is discriminatory on its face, but rather allege that Defendant applied the code in a discriminatory manner. Accordingly, Plaintiffs must show intentional discrimination. As fully explained above, the Court finds no evidence of intentional discrimination. See supra Part II(B)(i). Therefore, Defendant's Motion for Summary Judgment, insofar as it asks the court to dismiss Plaintiffs' claims under 42 U.S.C. § 1983 based on equal protection, is granted.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. Specifically, Plaintiffs' FHA and ADA claims based on intentional discrimination, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 based on the intentional discrimination under the FHA or ADA, and Plaintiffs' claims under 42 U.S.C. § 1983 based on equal protection violations are dismissed with prejudice. Plaintiffs' FHA and ADA claims based on Defendant's failure to make a reasonable accommodation and Plaintiffs' claims pursuant to 42 U.S.C. § 1983 based on Defendant's failure to make a reasonable accommodation under the FHA and ADA remain.

**SO ORDERED**, this the 7th day of February, 2006.

/s/ Hugh Lawson
**HUGH LAWSON, Judge**

scs